
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 18, 2017 at Knoxville

## DAVARIUS SMITH v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lauderdale County**
**No. 9190     Joseph H. Walker III, Judge**

_____

### No. W2016-00345-CCA-R3-PC

_____

The Petitioner, Davarius Smith, appeals as of right from the Lauderdale County Circuit Court's denial of his petition for post-conviction relief. The Petitioner contends that he was entitled to post-conviction relief based on the following alleged violations of his constitutional rights: (1) that the State withheld exculpatory evidence; (2) that, alternatively, he received ineffective assistance of trial and appellate counsel regarding this undisclosed evidence; (3) that he received ineffective assistance of trial counsel due to trial counsel's failure to file a motion to suppress a witness' prior identification of the Petitioner; and (4) that he received ineffective assistance of appellate counsel due to appellate counsel's failure to challenge an allegedly impermissible comment by the prosecutor during closing arguments and to properly challenge a special jury instruction provided by the trial court.[1] Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Tracey A. Brewer-Walker, Ripley, Tennessee, for the appellant, Davarius Smith.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; D. Michael Dunavant, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

---

[1] We have reordered and renumbered the Petitioner's issues from how they appear in his appellate brief for the sake of clarity.

FACTUAL BACKGROUND

*I. Trial*

Following a jury trial, the Petitioner was convicted of two counts of attempted second degree murder and one count each of reckless endangerment and employment of a firearm during the commission of a dangerous felony. State v. Davarius Datron Smith, No. W2013-01735-CCA-R3-CD, 2014 WL 3744637, at *1 (Tenn. Crim. App. July 28, 2014). The Petitioner received a total effective sentence of eighteen years' incarceration. Id. The factual background regarding the Petitioner's convictions is particularly relevant to our review. It was described by this court on direct appeal as follows:

> This case results from the [Petitioner's] convictions for shooting the two victims in a public park in Ripley. The victims, as well as other witnesses at the scene, professed at the time of trial to have little memory of the shootings, which had occurred a year earlier.
>
> Steven Whitelow, a victim of the shooting, testified that, on July 10, 2011, he was driving in his Suburban with his cousin, Javone Tatum. Around 6:00 p.m., they arrived at Rice Park in Ripley, where there was a crowd of over 100 people at the basketball court. After Whitelow claimed to have an almost total lack of recall as to the evening of the shooting, the State tendered to him a statement which he had written on July 10, 2011, regarding that evening, and which he said was "the truth." He said that the statement did not refresh his recollection, even though it was in his own handwriting, because he had a "bad memory." At the request of the State, Whitelow read the following: "I pulled up on the park. We got out to walk towards the Center and some guys in a white car said something to [Tatum]. A guy in the back seat on the passenger side hopped out and started shooting." Whitelow did not remember being shot at or where the shots came from, but did remember hearing gunshots and seeing that Tatum had been shot. He took Tatum to the emergency room at Lauderdale Hospital across the street because he had been shot in the side. After his Suburban was returned to him from the police department, Whitelow noticed that his back window had been "shot out" and that there were several bullet holes in the vehicle. Whitelow denied knowing the [Petitioner] or why the [Petitioner] would shoot at him or Tatum.
>
> Keving McNeal, a co-defendant, testified that he pled guilty to facilitation of attempted second degree murder of Whitelow and Tatum and to reckless endangerment. He said that he did so to go home to his child and that he and the [Petitioner] "did not commit the crimes." McNeal

testified that, on July 10, 2011, he and the [Petitioner] were in Rice Park watching the basketball game. When they heard gunshots, he and the [Petitioner] jumped in their white Pontiac G6 and left because he believed they were in danger. However, McNeal did not know of any reason why they were being shot at. They then drove to Covington. McNeal denied having "dumped" the car; rather, he explained that he dropped the car off for his pregnant girlfriend, Ashley Foxworth, to come pick it up because it was her car and he wanted her to have a car if she went into labor.

Ashley Foxworth, the mother of McNeal's child, said she owned a white Pontiac G6, which she loaned to McNeal on July 10, 2011. He told her that he was going to visit a friend from Ripley. When she received a call from him later that day, she became concerned and went to get her car in Covington. She admitted that she noticed bullet holes in her car, which she reported to the Ripley Police Department. The police department later impounded her car.

Willie Rouser Qualls testified that on July 10, 2011, he was in Rice Park near the basketball court where he organized the referees for the basketball game. He estimated that there were about fifty to seventy-five spectators, including children, around the basketball court. In the early evening he recalled hearing ten to twelve gunshots near the pavilion at the park. When he turned around to look in the direction of the gunshots, he saw a white car and a Suburban parked near the pavilion. After the shooting had stopped, he began walking in the direction of the gunshots while calling the Ripley Police Department. He saw the shooter, describing him as an African-American, slender male who was firing a weapon. He then observed the shooter get into the white car and leave the scene. The Suburban left shortly after and crossed the railroad tracks at a high rate of speed.

Demetrice Jones also remembered little of the shooting. She testified that, on July 10, 2011, she was watching the basketball game at Rice Park when she heard "probably" more than five gunshots. She agreed that she testified at a preliminary hearing, identifying the [Petitioner], also known as "Nudy B," as the shooter. She said the police showed her a photograph, telling her that it was "Nudy B," and she identified him as the shooter. She described the shooter as being African-American and having "dreads" but explained that there were several people with "dreads" near the pavilion, close to Whitelow's Suburban. However, she could not recall

testifying at the preliminary hearing that she saw Foxworth's white Pontiac at the park.

Javone Tatum had scant memory of the shootings and testified that he did not remember being with Whitelow on July 10, 2011. He said he remembered being shot but did not remember what had happened. He recalled meeting with the police and the prosecutor at the Ripley Police Department on June 11, 2012, where he was shown several photographs of the [Petitioner], but denied having identified the [Petitioner] as the shooter. He also denied having asked the prosecutor what would happen if he "[took] the Fifth after [he] identified [the [Petitioner]] as the shooter."

Investigator Louis Ruff with the Ripley Police Department testified that he responded to a call at Rice Park at about 6:30 p.m. on July 10, 2011, to investigate a shooting at the pavilion. He found nine shell casings from a nine-millimeter semiautomatic handgun at the scene. On the night of the shooting, the Ripley Police Department came into possession of Foxworth's white Pontiac after receiving a call from her. Searching the car, he found two nine-millimeter shell casings and noticed a bullet hole in the passenger side of the trunk. Examining Whitelow's Suburban, he found nine bullet holes in it, two holes on the driver's side, five in the tailgate area, and two on the passenger side. Investigator Ruff recovered numerous bullet fragments from the tailgate area, but they were so badly fragmented that they could not be tested. He did not recover a handgun from the scene, vehicle, or suspects. He confirmed that, at the preliminary hearing on November 4, 2011, Jones and Tatum identified the [Petitioner] as the shooter. Investigator Ruff also confirmed that, at the meeting at the Ripley Police Department on June 11, 2012, Tatum was shown a photograph of the [Petitioner] whom he identified as the shooter.

The [Petitioner] did not present any proof.

Id. at *1-3 (alterations referring to the "Petitioner" added, all other alterations in original).

## II. Direct Appeal

On direct appeal, the Petitioner argued that "he was entitled to certain documents regarding Investigator Ruff's testimony under Tennessee Rule of Criminal Procedure 16 and that the trial court should have granted his motion for a mistrial because of the nonproduction of the documents." Smith, 2014 WL 3744637, at *3. The direct appeal panel noted that the Petitioner "did not request a mistrial as his desired remedy when he offered his objection during the trial but only during the State's closing argument and in

response to that argument." Id. The panel then held that the Petitioner had not "met his burden showing the 'degree to which the impediments to discovery hindered trial preparation and defense at trial.'" Id. (quoting State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992)). In fact, the Petitioner had "not offered any argument or proof showing how any action on the part of the State or the trial court prejudiced his case." Id.

The Petitioner also argued "that the prosecutor committed prosecutorial misconduct during closing [arguments] by referring to the [Petitioner] as a 'thug,' making references to the Bible and to the civic duty of the jury to convict, and by impermissible vouching." Smith, 2014 WL 3744637, at *4. In addressing this argument, the direct appeal panel stated that it had "carefully reviewed the closing and rebuttal arguments of the State and [that it could not] share the [Petitioner's] view that they were so intemperate as to entitle him to a [new] trial." Id. The panel continued, stating that "[w]hile the State exhibited somewhat of a flair for the dramatic, the arguments were well within the permissible bounds and, certainly, neither entitled the [Petitioner] to a new trial nor violated his right to a fair trial." Id.

Finally, as pertinent to our review, the Petitioner argued that "the trial court erred in granting the State's request for a specific jury instruction on Tennessee Rule of Evidence 803" because it was "duplicative of the [pattern jury] instruction regarding identity." Smith, 2014 WL 3744637, at *6. The direct appeal panel concluded that the Petitioner had waived this issue because the Petitioner had "not provided a copy of the actual jury instructions given by the trial court." Id. The direct appeal panel rejected the Petitioner's remaining arguments and affirmed his convictions. See id. at *1. No application for permission to appeal was filed with our supreme court.

### III. Post-Conviction Proceedings

The Petitioner filed a timely petition for post-conviction relief. The petition's main allegation was that the State had "withheld potentially exculpatory evidence, to-wit: the discovery of two bullet casings allegedly discovered inside Ashely Foxworth's vehicle in which [the] Petitioner had been a passenger." The petition also alleged numerous instances of ineffective assistance of trial and appellate counsel.[2] The post-conviction court held a hearing on this matter at which Investigator Ruff, trial counsel, appellate counsel, and the Petitioner testified.

Investigator Ruff testified that he recovered nine shell casings at Rice Park and two shell casings from the white Pontiac G6. All of the shell casings were nine millimeters. Investigator Ruff could not recall if he took photographs of the shell casings

---

[2] This opinion will only address the factual and procedural background regarding the instances of ineffective assistance of counsel raised in the Petitioner's appellate brief.

before he seized them as evidence. Investigator Ruff testified that he turned over the shell casings and an evidence log of all of the other physical evidence collected in this case to the District Attorney General's Office. Investigator Ruff also testified that he never met with trial counsel about this case. Investigator Ruff explained that he would typically refer defense attorneys to the Assistant District Attorney General handling the case rather than speaking to a defense attorney directly. Investigator Ruff did not know what the Assistant District Attorney General disclosed to trial counsel about this case.

A few weeks before trial, the District Attorney General's Office requested that the shell casings recovered in this case be sent to the Tennessee Bureau of Investigation (TBI) for comparison with shell casings recovered from a shooting in Tipton County that the Petitioner was also accused of being involved in. Trial counsel was sent a copy of the fax requesting the shell casings be submitted to the TBI. Investigator Ruff testified that he believed the request had more to do with the Tipton County case than this case. The results of the TBI testing were not available at the time of trial, and Investigator Ruff admitted during cross-examination at trial that there was no forensic proof matching the shell casings found in the Pontiac to those found at Rice Park.

When the TBI analysis was later completed it showed that the shell casings in this case were not fired from the same gun as the shell casings from the Tipton County case. However, the TBI analysis revealed that the shell casings from the Pontiac were fired from the same gun as the shell casings recovered at Rice Park. Investigator Ruff testified at the post-conviction hearing that he believed the State's case against the Petitioner would have been stronger if he had the results of the TBI analysis at trial because he could have linked the shell casings in the Pontiac to the shooting.

Investigator Ruff also testified that he did not show Ms. Jones a photographic lineup because she had identified the Petitioner "by name" as the shooter in her handwritten statement. According to Investigator Ruff, he did not show Ms. Jones a photograph of the Petitioner until after she had given her statement and had identified the Petitioner as the shooter.

Trial counsel testified that he represented the Petitioner in this case and the Tipton County case. Trial counsel issued a subpoena asking for Investigator Ruff's case file and any supporting evidence which would have included Investigator's Ruff's evidence log. Trial counsel reviewed the discovery items he received from the State with the Petitioner prior to trial. However, trial counsel testified that he never received a copy of Investigator Ruff's evidence log and that he was unaware that shell casings were found in the Pontiac until the trial when the State provided him with a copy of the TBI forensic analysis request. Trial counsel reviewed the TBI request form with the Petitioner after he received it.

-6-

Trial counsel explained that he never asked to physically inspect the recovered shell casings because the theory of the case he planned to use at trial was that the Petitioner was not the shooter. Therefore, trial counsel did not think that the shell casings would be important to his theory of the case. In fact, the actual shell casings were never introduced at trial because they were at the TBI awaiting comparison with the shell casings from the Tipton County case.

When he was made aware of the shell casings found in the Pontiac, trial counsel asked the trial court to exclude any mention of the shell casings because "it would have been nice . . . [to] have [had] some knowledge of that so [he] could have planned in [his] trial strategy as to how to handle it." However, trial counsel testified at the post-conviction hearing that he did not think his trial strategy would have changed much if he had known about the shell casings prior to trial. Trial counsel explained that the Petitioner consistently told him that he was not the shooter and that he did not want to pursue a different theory of the case such as self-defense or that there was a third person in the Pontic with the Petitioner and Mr. McNeal.

Trial counsel testified that he did not think the shell casings found in the Pontiac were exculpatory. Trial counsel further testified that he did not ask for a continuance or a mistrial when he learned about the shell casings "because it could have only gotten worse." Trial counsel explained that, at trial, the State's proof "didn't connect [the Petitioner] to those shell casings, or any gun at all, or any shooting at all." Furthermore, no one at trial identified the Petitioner as the shooter, and Ms. Jones and Mr. Tatum recanted their earlier identifications of the Petitioner. Trial counsel believed that "[t]he proof [at trial] came out exactly how [the Petitioner] would have wanted it to."

Trial counsel recalled that all of the State's plea offers in this case were made in conjunction with the Tipton County case and that the Petitioner rejected the State's offers because he wanted six years for both cases. Trial counsel testified that he discussed the plea offers with the Petitioner and the pros and cons of taking a plea offer. Trial counsel further testified that he believed the Petitioner made an informed decision in rejecting the State's plea offers despite the fact that he was unaware of the shell casings found in the Pontiac. Trial counsel explained that he did not think the Petitioner would have made a different decision if he had known about the shell casings because the Petitioner never wavered from his claim that he was not the shooter. Furthermore, the Petitioner never asked trial counsel to attempt to reopen plea negotiations after he learned about the shell casings.

With respect to the prosecutor's closing arguments, trial counsel recalled that he did not ask for a mistrial because the proof at trial had "come out the best [they] could have hoped for" with no witnesses identifying the Petitioner as the shooter. With respect to Ms. Jones's prior identification of the Petitioner, trial counsel stated that he did not file

a motion to suppress her identification on the grounds that she was shown a picture of only the Petitioner because Ms. Jones "had already given a statement clearly identifying" the Petitioner before she was shown the photograph.

Appellate counsel testified that he was appointed to represent the Petitioner after trial counsel filed the motion for new trial. Appellate counsel filed an amended motion for new trial that incorporated the arguments from the original motion. Appellate counsel testified that he raised the issue of the State's failure to turn over documents regarding the investigation, but he admitted that he did not provide any argument regarding how the failure to disclose those documents prejudiced the Petitioner because, having not been the trial counsel in this case, he was unaware of how the discovery violation affected trial counsel's preparation. Appellate counsel further testified that he did not specifically raise the issue of the shell casings found in the Pontiac because it did not strike him as being significant. Appellate counsel explained that he thought of it as a discovery issue rather than a constitutional issue.

With respect to the prosecutor's comment about self-defense during his closing argument, appellate counsel testified that he did not include it with the other alleged instance of misconduct because he "just didn't catch it." Appellate counsel testified that he would include that comment if he could do the appeal over. Appellate counsel admitted that he failed to order a transcript of the jury instructions despite having raised a jury instruction issue in his appellate brief.

The Petitioner testified that he hired trial counsel to represent him in this case and the Tipton County case. The Petitioner admitted that trial counsel met with him multiple times at the jail and corresponded with him while this case was pending. The Petitioner recalled that the State's plea offer was a "package deal." The Petitioner explained that he wanted to plead in this case and go to trial in the Tipton County case, but the Assistant District Attorney General only offered a plea agreement that disposed of both cases. The Petitioner testified that the offer for both cases was eleven years and that he ultimately received an eighteen-year sentence in this case.

The Petitioner testified that he did not know about the shell casings found in the Pontiac when he rejected the State's plea offer. The Petitioner claimed that if trial counsel had inspected the physical shell casings and shared that with him, it would have "made a big difference" because he "was not afforded the evidence that [the State planned] . . . to secretly use against [him] halfway through the trial." The Petitioner continued, stating that without knowing about the shell casings, he was not able to "weigh all [of his] options." The Petitioner characterized the shell casings as having been "the whole case" against him and that he "could have considered" taking the plea agreement or a different trial strategy if he had known about them prior to trial. The

Petitioner asserted that he would have taken the plea offer if he had known about the shell casings.

The Petitioner testified that he was "shocked" when he first heard about the shell casings during the trial. The Petitioner admitted that trial counsel reviewed the TBI request form with him prior to Investigator Ruff's testimony. However, the Petitioner testified that he did not think the shell casings actually existed because they were not introduced into evidence at trial. After being shown pictures of the shell casings prior to the post-conviction hearing, the Petitioner testified that he believed that Investigator Ruff "planted" the shell casings in Ms. Foxworth's car. The Petitioner testified that he was not the shooter in this case, that this was what he consistently told trial counsel, and that he never suggested a different defense strategy to trial counsel such as self-defense or there being a third person in the car. The Petitioner admitted that he did not know if having been aware of the shell casings prior to trial would have changed the outcome of his trial.

The post-conviction court issued a written opinion denying the petition. The post-conviction court concluded that the Petitioner had "failed to show how the shell casing[s] were exculpatory, or any action by defense counsel with regard to the shell casings that [constituted] ineffective assistance." The post-conviction court also concluded that the Petitioner had "failed to show how" trial counsel's having not filed a suppression motion regarding Ms. Jones's prior identification "was deficient performance, or how this was prejudicial." Likewise, the post-conviction court concluded that the Petitioner had failed to show deficient performance or prejudice regarding appellate counsel's handling of the direct appeal.

## ANALYSIS

The Petitioner contends that the State withheld exculpatory evidence in the shell casings found in Ms. Foxworth's Pontiac G6.[3] Alternatively, the Petitioner contends that he received ineffective assistance of trial and appellate counsel regarding the shell casings. The Petitioner also contends that trial counsel was ineffective for failing to file a motion to suppress Ms. Jones's pretrial identification of the Petitioner as the shooter. The Petitioner further contends that appellate counsel was ineffective for failing to challenge the prosecutor's comment regarding self-defense and for failing to include a transcript of the jury instructions in the direct appeal record. The State responds that the shell casings

---

[3] In his brief, the Petitioner also includes with this issue evidence of the bullet fragments recovered from Ms. Foxworth's car and photographs of the shell casings as found in the car allegedly taken by Investigator Ruff. These issues were not raised in the petition for post-conviction relief and are deemed waived. See Tenn. Code Ann. §§ 40-30-110(c), (f) (limiting the proof at the post-conviction hearing to "evidence of the allegations of fact in the petition" and noting that there "is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived").

were not exculpatory and that the Petitioner has failed to establish ineffective assistance of trial or appellate counsel.

*I. Standard of Review*

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

*II. Disclosure of Shell Casings*

*A. State's Failure to Disclose*

The Petitioner argues that the shell casings found in the white Pontiac G6 were exculpatory and that the State violated his constitutional right to due process by failing to disclose their existence. Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001).

The shell casings found in the Pontiac G6, as the subsequent forensic testing by the TBI revealed, were not exculpatory in nature because they were fired from the same gun as the shell casings found in Rice Park. Therefore, the State's failure to disclose the shell casings did not rise to the level of a constitutional violation. Mere discovery violations, as opposed to the withholding of exculpatory evidence, "cannot be used as a basis for granting post-conviction relief." Wayne E. Mitchell v. State, No. 01C01-9507-CR-00227, 1996 WL 234053, at *2 (Tenn. Crim. App. May 9, 1996). Accordingly, we conclude that the post-conviction court did not err in denying relief on this issue.

*B. Effectiveness of Trial and Appellate Counsel Regarding the Shell Casings*

Alternatively, the Petitioner contends that he received ineffective assistance from his trial and appellate counsel with respect to the issue of the shell casings found in Ms. Foxworth's Pontiac. Specifically, the Petitioner argues that trial counsel was ineffective for failing to discover the shell casings by physically inspecting the State's evidence and for failing to request a mistrial after Investigator Ruff testified about the shell casings. The Petitioner contends that he was prejudiced by trial counsel's actions because he was not able to effectively develop a trial strategy or evaluate the State's plea offer. The Petitioner also argues that appellate counsel was ineffective for failing to properly address this issue on appeal.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In determining whether appellate counsel's failure to raise an issue on appeal constitutes ineffective assistance of counsel, our supreme court has held that "unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim." Carpenter v. State, 126 S.W.3d 879, 887-88 (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel" as these are "tactical and strategic choices," which should not be second-guessed. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

Here, trial counsel testified that he did not feel compelled to physically inspect the shell casings because the Petitioner had consistently told him that he was not the shooter and did not want to pursue any other defenses. The Petitioner admitted to this fact during his testimony at the post-conviction hearing. The determination of "what investigation decisions are reasonable depends critically on . . . information" provided to trial counsel by the petitioner. Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting Strickland, 466 U.S. at 691). Trial counsel's belief that physical inspection of the shell casings was not necessary was reasonable given the Petitioner's consistent claim that he was not the shooter in this case.

With respect to trial counsel's failure to seek a mistrial following Investigator Ruff's testimony about the shell casings, trial counsel explained that he did not seek a mistrial "because it could have only gotten worse." The shell casings were not physically admitted into evidence at trial, and Investigator Ruff had to admit on cross-examination that there was no forensic evidence to connect the shell casings found in the Pontiac with those found at Rice Park. Had the Petitioner's trial been after the TBI had issued its report, then the State would have known the highly inculpatory fact that the shell casings from the Pontiac and Rice Park were fired from the same gun. Furthermore, trial counsel testified that he did not seek a mistrial because a victim and an eyewitness who had previously identified the Petitioner as the shooter recanted those identifications during the trial. As such, we believe trial counsel's decision not to seek a mistrial was reasonable in light of the proof at trial.

Likewise, we do not find the Petitioner's arguments regarding prejudice persuasive. Trial counsel stated that during the trial "it would have been nice" to have known about the shell casings "so [he] could have planned in [his] trial strategy as to how to handle it." However, trial counsel testified at the post-conviction hearing that his trial strategy would not have changed had he known about the shell casings prior to trial because the Petitioner had consistently claimed that he was not the shooter and that he did not want to pursue another defense strategy. With respect to the Petitioner's rejection of the State's plea offer, the Petitioner testified that he wanted to plead guilty in this case but go to trial on the Tipton County case. However, the State would only accept a plea agreement that disposed of both cases. Again, the Petitioner never wavered from his claim that he was not the shooter and reiterated it at the post-conviction hearing. Furthermore, the Petitioner did not ask trial counsel to attempt to reopen plea negotiations when he learned about the shell casings during the trial. Accordingly, we conclude that the Petitioner's claim that he would have accepted the State's plea offer if he had known about the shell casings prior to trial was not supported by the evidence.

With respect to appellate counsel, he testified at the post-conviction hearing that he did not specifically raise the issue of the shell casings because it did not strike him as

-12-

being significant. Rather, appellate counsel thought of it as a discovery issue rather than a significant constitutional issue. This was a tactical and strategic choice that was within appellate counsel's province to make, and we will not second-guess it. The Petitioner also faults appellate counsel for not making an argument to this court on direct appeal as to how the alleged discovery violation hindered trial counsel's preparation. However, this argument lacks merit in light of trial counsel's testimony at the post-conviction hearing that his trial strategy would not have changed had he known about the shell casings before trial. Accordingly, we conclude that the post-conviction court did not err in denying the petition with respect to the issue of the effectiveness of trial and appellate counsel's handling of the shell casings found in the Pontiac G6.

### III. Ineffective Assistance of Trial Counsel

The Petitioner contends that he received ineffective assistance of trial counsel due to trial counsel's failure to file a motion to suppress Ms. Jones's prior identification of him as the shooter.[4] The Petitioner argues that Ms. Jones was shown only a photograph of him and not a photographic lineup; therefore, her identification was inherently suspect. However, Ms. Jones was shown the photograph of the Petitioner only after she had identified the Petitioner by his nickname to Investigator Ruff and again in her written statement. Furthermore, the Petitioner has failed to demonstrate prejudice in light of the fact that Ms. Jones recanted her prior identification at trial. Accordingly, we conclude that the post-conviction court did not err in denying the petition with respect to this issue.

### IV. Ineffective Assistance of Appellate Counsel

The Petitioner contends that appellate counsel was ineffective for failing to challenge the prosecutor's statement during closing arguments that there had "certainly been no self-defense argument raised" during trial that the Petitioner shot at the victims because they had shot at him. The Petitioner argues that this was an impermissible comment on his decision not to testify at trial. See State v. Jackson, 444 S.W.3d 554 (Tenn. 2014). However, the context of the prosecutor's argument does not support the Petitioner's claim.

The prosecutor made his comment in a rambling paragraph discussing the victims' reluctance to testify. The prosecutor suggested that the victims might have been involved in the shooting immediately before stating that there had "been no self-defense argument raised." Furthermore, appellate counsel raised several other instances of what he

---

[4] In his brief, the Petitioner also argues that trial counsel should have filed a motion to suppress Mr. Tatum's prior identification. However, the Petitioner provides no argument as to what grounds or legal basis existed to support filing such a motion. The Petitioner has waived our consideration of this issue by failing to present any argument to support this claim. See Tenn. R. Ct. Crim. App. 10(b) (providing for waiver of issues not supported by argument).

believed to be impermissible argument by the prosecutor, and this court "carefully reviewed the closing and rebuttal arguments of the State" and found no reversible error on direct appeal. Smith, 2014 WL 3744637, at \*4. Accordingly, we conclude that the post-conviction court did not err in denying the petition with respect to this issue.

The Petitioner also contends that appellate counsel failed to properly challenge a special jury instruction provided by the trial court. The Petitioner argues that appellate counsel waived direct appellate review of the issue by failing to include the jury charge in the appellate record. However, the Petitioner failed to provide a transcript or copy of the jury instruction at the post-conviction hearing or in the record currently before us. Without the jury instruction, we cannot determine whether the Petitioner was prejudiced by appellate counsel's action. See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (addressing the analogous situation of alleging ineffective assistance of counsel for failing to discover, interview or present witnesses but not presenting those witnesses at the post-conviction hearing). Accordingly, we affirm the post-conviction court's denial of the petition with respect to this issue.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-14-